IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STUDENT DOE, *et al.*,

    *Plaintiffs*,

v.

COMMUNITY COLLEGE OF
BALTIMORE COUNTY, *et al*.,

    *Defendants*.

Civil No. ELH-21-180

**MEMORANDUM OPINION**

In this sex discrimination case, the plaintiffs, proceeding under the pseudonyms Student

Doe as well as Mother Doe and Father Doe, in their individual and representative capacities, filed

suit against a host of defendants, asserting multiple claims. *See* ECF 11 (the "Complaint"); ECF

1-1 at 2-39 (same).[1]  In particular, they have sued the Community College of Baltimore County,

d/b/a CCBC ("CCBC"); the Board of Trustees of the Community College of Baltimore County,

d/b/a CCBC (the "Board" or the "Trustees"); the Community College of Baltimore County,

Dundalk Campus, d/b/a CCBC-Dundalk ("CCBC-Dundalk") (collectively, the "CCBC

Defendants"); Baltimore County (the "County"); the State of Maryland (the "State"); and the

Maryland Higher Education Commission (the "Commission").   In addition, the Complaint names

eight individuals as defendants: Sandra Kurtinits, Ph.D., the President of CCBC; Melissa Hopp,

the Vice President of Administrative Services for CCBC; Penny Milsom, CCBC's Executive

---

[1] Suit was initially filed in the Circuit Court for Baltimore County on December 8, 2020.
ECF 11.  Defendants removed the case to federal court on January 21, 2021, pursuant to 28 U.S.C.
§§ 1331, 1441, 1446.  *See* ECF 1.  Jurisdiction is founded on 28 U.S.C. § 1331 based on plaintiffs'
Title IX claim.  ECF 1, ⁋ 4.  And, the Court may exercise supplemental jurisdiction with regard to
plaintiffs' remaining State law claims, as the State and federal claims "are based on the legal theory
that the inappropriate conduct of [defendant Webster] denied Plaintiff the benefits of an
educational institution based on her sex." *Id.* ⁋ 6; *see* 28 U.S.C. § 1367.

Director for Human Resources; Carol Sullivan, Ph.D., Dean of CCBC-Dundalk; Jean Ashby, Dean of the School of Mathematics and Science at CCBC; Michael Venn, Assistant Dean of Mathematics at CCBC; Mary Walkins, a professor at CCBC and coordinator for the School of Mathematics & Science for CCBC-Dundalk; and Douglas Webster, a member of the CCBC faculty (collectively, the "Individual Defendants").[2] The Complaint is supported by one exhibit. *See* ECF 11 at 40-52

In sum, plaintiffs allege that while Student Doe was enrolled at CCBC-Dundalk, she was sexually harassed by her math professor, defendant Webster. At the time, Student Doe was 17 years old. ECF 11, ⁋ 24.

In the proverbial "kitchen sink" approach, the suit contains eleven counts. Plaintiffs assert claims for negligence (Count I); negligent hiring, training, supervision, and retention (Count II); gross negligence (Count III); violations of Maryland's anti-discrimination law, Md. Code (2021 Repl. Vol.), §§ 20-301, 20-304, 20-801, and 20-901 of the State Government Article ("S.G.") (Count IV); breach of contract (Count V); quantum meruit (Count VI); unjust enrichment (Count VII); detrimental reliance (Count VIII); breach of fiduciary duty (Count IX); intentional infliction of emotional distress, alleged as to the Individual Defendants (Count X); and violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* ("Title IX") (Count XI). Plaintiffs seek both compensatory and punitive damages, as well as attorney's fees, interest, and costs. ECF 11 at 37.

---

[2] Plaintiffs subsequently filed a notice of voluntary dismissal as to the State and the Commission, without prejudice. *See* ECF 27. And, I approved the dismissal by Order of March 17, 2021. *See* ECF 29.

Defendants have moved to dismiss Counts I through IX of the Complaint (ECF 24), pursuant to Fed. R. Civ. P. 12(b)(6), supported by a memorandum of law. ECF 24-1 (collectively, the "Motion"). They have also filed one exhibit, which includes a copy of a photograph of Webster, filed under seal. *See* ECF 25.[3] Defendants do not seek dismissal of Counts X or XI.

Plaintiffs oppose the Motion. *See* ECF 32 (the "Opposition"). Notably, they concede that Counts V through IX are barred by limitations and thus subject to dismissal. *Id.* at 11. Defendants have replied. ECF 35 (the "Reply").[4]

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.    Background[5]

Student Doe began to attend the Dundalk Campus of CCBC in the fall of 2017, when she was seventeen years of age. ECF 11, ¶¶ 24, 72-74. She enrolled in a math course taught by Webster. *Id.* ¶ 75. At the time, Webster was 61 years old. *Id.* ¶ 77.[6]

Plaintiffs assert that Webster was "hired by CCBC despite his disturbing criminal background, including the harassment and stalking of a bartender in Charles County, Maryland in

---

[3] ECF 25 is accompanied by defendants' "Motion for Leave to File Under Seal Exhibit in Support of Motion to Dismiss Counts I-IX for Failure to State a Claim." ECF 26. I granted the motion by Order of March 18, 2021. *See* ECF 28.

[4] Curiously, the Reply is titled: "Memorandum In Opposition To Plaintiffs' Opposition . . . ."

[5] At this juncture, the Court assumes the truth of the allegations, as stated in the Complaint. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

[6] Defendants contend that Webster was 45 years of age at the time of the events described in the Complaint. ECF 24-1 at 3.

2011." ECF 11, ⁋ 25.[7]  According to plaintiffs, defendants violated their own protocols by failing to conduct a background check on Webster, which would have revealed his criminal history.  *Id.* ⁋⁋ 26, 61, 62.

Specifically, plaintiffs claim that Webster was previously charged with criminal harassment, trespassing on private property, stalking, and two counts of "Damaging/Tampering with Motor Vehicle Without Owner Consent . . . ."  *Id.* ⁋ 47.  On September 30, 2011, Webster "pled guilty to one count of Harassment in violation of Maryland Code, Criminal, § 3-803, in the Circuit Court for Charles County, Maryland."  *Id.* ⁋ 27.   And, on October 7, 2011, he was sentenced to 90 days' imprisonment, with all but time served suspended.  *Id.* ⁋ 49.

In addition, Webster was placed on a five-year term of probation, which was terminated "sometime in 2016."  *Id.* ⁋⁋ 49, 57.   At the outset of Webster's probation, he wrote two letters to the State judge in Charles County,  in which he reasserted his innocence and requested termination of his probation.  *Id.* ⁋⁋ 50-53.  After Webster's probation expired, he "applied for a teaching position" at CCBC "as a faculty member in the School of Mathematics and Science."  *Id.* ⁋ 59.

According to the Complaint, the information relating to Webster's prior conviction is "publicly available and easily accessible" via the "online database of Maryland court cases . . . ." *Id.* ⁋ 63.  Moreover, plaintiffs contend that CCBC could have submitted a "request for details of [Webster's] conviction under the Maryland Public Information Act . . . to the Circuit Court for Charles County, the Charles County State's Attorney's Office, or the Charles County Sheriff's Office . . . ."  ECF 11, ⁋ 64.

---

[7] The details of Webster's prior offense are summarized in the Complaint (*see* ECF 11, ⁋⁋ 27-49) and corroborated in documents included in an exhibit appended to the Complaint.  *See id.* at 41-52.  However, the Opposition posits that Webster had no criminal history.  ECF 24-1 at 3.

Further, plaintiffs assert: "CCBC, its employees, agents, and/or servants . . . stood in *loco parentis* with many of its students, some of whom were under the age of eighteen years old and required their parent or guardian's authority and/or permission to attend." *Id.* ¶ 67.  Therefore, they allege that defendants' failure to run a background check on Webster "placed [CCBC's] 'young women,' particularly underage women, at risk by putting them in a classroom under the authority of Defendant Webster." *Id.* ¶ 68.  Further, the Complaint asserts that fault lies with defendants Kurtinitis, Hopp, Milsom, Sullivan, Ashby, Venn, and Walkins because they "all participated in the hiring, training, and supervision" of Webster. *Id.* ¶ 111.

Plaintiffs allege that, "[o]n the last day of class for the Fall 2017 semester, Defendant Webster handed Student Doe a packet of documents folded into an envelope." *Id.* ¶ 78.  The front of the envelope reflected "Student Doe's address in Baltimore County" as well as Webster's "return address in Fallston, Maryland." *Id.* ¶ 79.  And, a "Post-It Note was attached to the envelope in Defendant Webster's handwriting," which advised Student Doe to wait between two and three hours before opening the envelope, as it had "the potential to be disruptive." *Id.* ¶ 80.

The envelope contained various letters, poems, and notes that Webster had written to Student Doe between October 22, 2017 and December 12, 2017. *See id.* ¶¶ 81-88.[8]  Their contents are reproduced in full in the Complaint. *See id.*  In short, the "letters, poems, stories, and notes exhibit an intense sexual obsession over Student Doe that Defendant Webster hesitantly, yet boldly, reveals over the course of three months." *Id.* ¶ 89.  In particular, "Defendant Webster reference[d] dangerous and troubling behavior such as admittedly violating Student Doe's privacy and accessing her home address . . . and creating a Facebook account to access her information

---

[8] Plaintiffs did not specify the date of the last day of class in the fall of 2017.  But, apparently, it was no earlier than December 12, 2017.

online." ECF 11, ¶ 92; *see id.* ¶¶ 82, 84, 86.  Moreover, according to the Complaint, the letters indicate that Webster "wanted to act on his feelings with Student Doe when she was sick and again, when she was alone with him making up an exam after class." *Id.* ¶ 93; *see id.* ¶¶ 84, 87.

And, of particular import here, Webster indicated in a letter dated October 22, 2017, that he told "his boss" of his feelings for Student Doe, "who threatened termination." *Id.* ¶ 83 at 15. But, "[a]fter going back & forth," Webster averred that his boss "accept[ed] that [he] ha[d] no desire to interfere with [Student Doe's] education." *Id.*

Further, the Complaint asserts that defendants Ashby, Venn, and Walkins "were all aware of Defendant Webster's feelings for Student Doe at the beginning of the semester, all possessed the authority to transfer Student Doe into another classroom, discipline Defendant Webster (including termination), recommend Defendant Webster for discipline (including termination), and intervene after Defendant Webster expressed a sexual desire for underage Student Doe to prevent harm to [her]." *Id.* ¶ 113.  Yet, Ashby, Venn, and Walkins allegedly allowed Webster to "proceed teaching [Student Doe] as long as he kept their relationship professional," which was "in direct violation of the rules and regulations regarding faculty-student relationships and sexual harassment at CCBC." *Id.* ¶¶ 90-91.

Plaintiffs also note that Webster "would frequently take a 20-minute break" during class periods, to "go outside [and] smoke marijuana . . . ." *Id.* ¶ 95.  Webster would also "frequently write during class periods when the class was completing their assignments," which, according to the Complaint, "was likely when Defendant Webster composed his letters." *Id.* ¶ 96.

As a result of Webster's actions, "Student Doe was unable to complete her studies at CCBC-Dundalk." *Id.* ¶ 97.  Moreover, Student Doe "developed severe anxiety and depression," for which she now takes medication. *Id.* ¶ 98.  Further, she "suffered multiple panic attacks,"

became  "scared to be alone," as well as "terrified of older men."  ECF 11, ⁋ 99.  She also "developed issues sleeping at night and being touched by other persons."  *Id.* ⁋ 100.  And, "[h]er trust in school administrators and her instructors was broken."  *Id.* ⁋ 101.

Student Doe "has undergone nearly 3 years of therapy, which will continue indefinitely into the future."  *Id.* ⁋ 102. Following the recommendation of a mental health professional, "she also had to purchase a comfort animal to keep her company when she was alone."  *Id.* ⁋ 103.  And, Student Doe developed a personalized safety plan, "[a]t the recommendation of law enforcement and victim services," which "dramatically altered" her life.  *Id.* ⁋ 104.[9]

In addition, Mother Doe and Father Doe contend that their trust in "CCBC, the school administration, and her instructors . . . was shattered."  *Id.* ⁋ 106.  Moreover,  "[b]oth parents have developed significant anxiety when their daughter was/is alone and when she is out of their sight." *Id.* ⁋ 107.  And, "this incident has hampered both Parents Doe and Student Doe's development of independence as a young woman . . . ."  *Id.* ⁋ 108.

Plaintiffs allege that they substantially complied with the notice requirements of the Local Government Tort Claims Act ("LGTCA"),  Md. Code (2020 Repl. Vol., 2021 Supp.), §§ 5-301 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."), and the Maryland Tort Claims Act ("MTCA"), S.G. §§ 12-101 *et seq.*  In particular, plaintiffs advise that they "placed Defendants on notice of their claim" by mailing the required notice via "certified, first-class U.S. mail, postage prepaid, return receipt requested to Baltimore County, Maryland, on or before November 14, 2018," and to Nancy Kopp, the State Treasurer, on or before November 8, 2018.  *Id.* ⁋ 124.

---

[9] The Complaint purports to describe Student Doe's safety plan.  *See* ECF 11, ⁋ 105.  But, the details of this plan were redacted and plaintiffs have not filed an unredacted version.

## II.      Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.
*Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *see In re Birmingham*, 846
F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Services Bd.,* 822 F.3d 159, 165-66 (4th Cir.
2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v.
Young,* 569 U.S. 221 (2013); *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).  A
Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a
plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be
granted."  *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan
Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472,
473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading
requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d
321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  The
rule provides that a complaint must contain a "short and plain statement of the claim showing that
the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair
notice" of the claims and the "grounds" for entitlement to relief.  *Twombly*, 550 U.S. at 555-56.

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state
a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556
U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading
standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir.
2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir.
2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include

"detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing'" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co*., 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Md. Transit Admin*., 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc*., 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington County*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the

pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*) (citation omitted).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th

Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg. v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows. Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998); *see USA Eng. Language Ctr. v. Accrediting Council for Continuing Educ. & Training, Inc.*, __F. App'x__, 2021 WL 3162671, at *2 (4th Cir. July 27, 2021). And, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 882 F.3d at 167. In other words, the "general rule" is that "the exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint." *Goines*, 882 F.3d at 165. But, "in cases where

the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.* at 167.

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __U.S__, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

As mentioned, plaintiffs appended one exhibit to the Complaint.  ECF 11 at 40-52.  It includes documents reflecting the details of Webster's criminal history, which are integral to plaintiffs' suit.  Therefore, I may consider them in resolving the Motion.  However, plaintiffs did not reference the photograph of Webster that defendants attached as an exhibit to the Motion (ECF 25), nor is it integral to their suit.  Therefore, I shall not consider ECF 25 in resolving the Motion.

### III.    Discussion

The Motion presents a number of contentions challenging Counts I through IX of the Complaint.

Defendants posit: "Neither the Local Government Tort Claims Act or the Maryland Torts Claim Act [sic] authorizes direct lawsuits against the County or CCBC Defendants for negligence

or gross negligence." ECF 24-1 at 2.   According to defendants, the LGTCA and the MTCA do not provide a basis for plaintiffs to sue the County or the Board directly based on the alleged tortious conduct of their employees. *Id.* at 4.  Defendants also summarily assert that the Board is entitled to sovereign immunity. *Id.*  In the Reply, defendants aver that "The Board of Trustees and CCBC have sovereign immunity for State claims above $100,000." ECF 35 at 2, 4.

In addition, as to Count II, defendants argue: "The mere allegation that there has been a violation of Title IX is not sufficient to sustain a claim for negligent supervision and retention." ECF 24-1 at 2.  Further, defendants insist that Count IV must be dismissed because "Maryland law does not authorize a private right of action for sex based discrimination in public accommodations." *Id.*  And, the Motion urges the Court to dismiss Counts V through IX, as time-barred. *Id.* at 9.

## A.  Contract Claims

Plaintiffs assert a variety of contract related claims.  As mentioned, Count V alleges breach of contract; Count VI asserts quantum meruit; in Count VII plaintiffs allege unjust enrichment; Count VIII asserts detrimental reliance; and Count IX alleges breach of fiduciary duty. *See* ECF 11, ¶¶ 159-182. [10]

Suit was filed in State court on December 8, 2020.  The events at issue occurred in the Fall of 2017.

In the Motion, defendants argue that Counts V through IX are subject to dismissal because they are time-barred. ECF 24-1 at 9.  Plaintiffs concede the point in their Opposition and expressly "consent to the dismissal without prejudice of the contractual claims . . . should Plaintiff discover

---

[10] To my knowledge, breach of fiduciary duty in Maryland is typically regarded as a tort claim. *See Plank v. Cherneski*, 469 Md. 548, 559, 231 A.3d 436, 442 (2020).  Nonetheless, plaintiffs do not dispute the characterization of Count IX as a contract claim.

facts that warrant their inclusion."  ECF 32 at 11.  Accordingly, I shall dismiss Counts V through IX, without prejudice.

### B.  Maryland Anti-Discrimination Law

In Count IV, plaintiffs claim that defendants violated various provisions of Maryland's anti-discrimination law.  *See* ECF 11, ¶¶ 152-158.  In particular, the Complaint alleges violations of S.G. §§ 20-301, 20-304, 20-801, and 20-901.  *See* ECF 11, ¶¶ 153-156.  Defendants urge the dismissal of Count IV, arguing that Maryland law does not "authorize a private right of action" for sex discrimination in places of public accommodation.  ECF 24-1 at 8 (citing *Hart v. Harbor Court Assocs.*, 46 F. Supp. 2d 441, 444 (D. Md. 1999) and *Pritchett v. General Motors Corp.*, 650 F. Supp. 758, 761 (D. Md. 1986)).

Discrimination in places of public accommodation is addressed in Subtitle 3 of Title 20 of the State Government Article.  S.G. § 20-304 provides:

> An owner or operator of a place of public accommodation or an agent or employee of the owner or operator may not refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, or privileges of the place of public accommodation because of the person's race, sex, age, color, creed, national origin, marital status, sexual orientation, gender identity, or disability.

Further, under S.G. § 20-302, a place of public accommodation may deny services "to any person for failure to conform to the usual and regular requirements, standards, and regulations of the establishment, provided that the denial is not based on discrimination" on the grounds previously specified.

In addition, S.G. § 20-901(a) provides that "a unit, officer, or employee of the State, a county, or a municipal corporation may not engage in a discriminatory act prohibited by § 20-304 . . . ."  And, under S.G. § 20-801, a "person may not" (1) "aid, abet, incite, compel, or coerce any person to commit a discriminatory act;" (2) "attempt, directly or indirectly, alone or in concert

14

with others, to commit a discriminatory act;" or (3) "obstruct or prevent any person  from complying with this title or any order issued under this title."

As an initial matter, the campus of a community college does not fall squarely within the definition of "a place of public accommodation" under Maryland law.  In S.G. § 20-301, "a place of public accommodation" is defined as follows:

(1) an inn, hotel, motel, or other establishment that provides lodging to transient guests;

(2) a restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food or alcoholic beverages for consumption on or off the premises, including a facility located on the premises of a retail establishment or gasoline station;

(3) a motion picture house, theater, concert hall, sports arena, stadium, or other place of exhibition or entertainment;

(4) a retail establishment that:

(i) is operated by a public or private entity; and

(ii) offers goods, services, entertainment, recreation, or transportation; or

(5) an establishment

(i)    1. that is physically located within the premises of any other establishment covered by this subtitle; or

2. within the premises of which any other establishment covered by this subtitle is physically located; and

(ii) that holds itself out as serving patrons of the covered establishment.

Plaintiffs contend that a college fits this definition because "[t]here is no doubt that a college includes a 'cafeteria' and a 'lunchroom.'"  ECF 32 at 10.   Further they assert: "Most schools include at least one of the following: a theatre (for movies or performing arts), a concert hall, a stadium or arena, an art gallery, or other place of exhibition/entertainment."  *Id.*   But, plaintiffs do not cite, and the Court is unaware of, any cases indicating that a community college

constitutes a place of public accommodation under Maryland law. *Cf. Gandy v. Howard County Bd. of Educ.*, GLR-20-3436, 2021 WL 3911892, at *10 (D. Md. Sept. 1, 2021) (finding that a Maryland public school is not a place of public accommodation within the meaning of S.G. § 20-301).

In any event, Maryland law "does not give rise to a private right of action" for discrimination in places of public accommodation. *Gandy*, 2021 WL 3911892, at *10. Rather, a person subject to discrimination in a place of public accommodation "may file a complaint" with the Maryland Commission on Civil Rights ("MCCR"), and the MCCR may issue a complaint against the alleged perpetrator of discrimination "on its own motion." S.G. § 20-1004; *see id.* § 20-101 (defining "discriminatory act" to include acts prohibited under the public accommodations provisions).

As Judge Chuang of this Court has noted, the statute "expressly provides the right to file a civil action to individuals subject to employment discrimination, *id.* 20-1013(a) and discrimination in housing practices, *id.* § 20-1035, [but] there is no comparable provision providing a private right of action for claims of discrimination in public accommodations." *M.R. by and through N.R. v. Tajdar*, TDC-17-3836-2018 WL 6050888, at *5 (D. Md. Nov. 19, 2018); *see Baker v. Greyhound Bus Line*, 240 F. Supp. 2d 454, 455 (2003).

Plaintiffs acknowledge that "the actual text of Subtitle 10 indicates that [a cause of action] only applies to discrimination in employment and housing." ECF 32 at 10 (emphasis omitted). Nonetheless, they argue that the Court should find that a cause of action is available to plaintiffs, pursuant to Article 19 of the Maryland Declaration of Rights, on the ground that this provision "guarantees a remedy for injury to person or property." *Id.* (internal quotation marks omitted). In short, plaintiffs contend that "Article 19 allows for a private right of action when statute [sic] that

prohibits conduct but does not independently provide a remedy allows for a private right of action." *Id.* at 11 (citing *Jackson v. The Dackman Co.*, 422 Md. 357, 377, 30 A.3d 854, 866 (2011)).

Plaintiffs' position is untenable. Article 19 specifies, in relevant part: "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land . . . ." It is intended to ensure "access to courts." *Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1327 (D. Md. 1989). As the Maryland Court of Appeals has explained, "[i]t is a basic tenet, expressed in Article 19 . . . , that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong." *Dua v. Comcast Cable*, 370 Md. 604, 644, 805 A.2d 1061, 1084 (2002) (quoting *Ashton v. Brown*, 339 Md. 70, 105, 660 A.2d 447, 464-65 (1995)) (alteration in *Dua*).

But, a "'statutory restriction upon access to the courts violates Article 19 only if the restriction is unreasonable.'" *Johnson v. Maryland State Police*, 331 Md. 285, 297, 628 A.2d 162, 168 (1993) (quoting *Murphy v. Edmonds*, 325 Md. 342, 365, 601 A.2d 102, 113 (1992)). Indeed, "several restrictions upon traditional remedies or access to the courts have been upheld under Article 19 as reasonable." *Piselli v. 75th Street Medical*, 371 Md. 188, 206, 808 A. 2d 508, 519 (2002). The Maryland Court of Appeals explained, albeit in another context, *id.* at 206-07, 808 A.2d at 519 (internal citations omitted):

> [W]e have held that Article 19 does not require the recognition of a new tort cause of action which has never previously been recognized in Maryland . . . . This Court has indicated that the Legislature may reasonably limit the amount of damages recoverable in tort cases for non-economic damages without violating Article 19 . . . . The Court has also held that "the Legislature may ordinarily substitute a statutory remedy, including a statutory administrative and judicial review remedy, for a common law remedy without violating Article 19 of the Declaration of Rights," . . . . Article 19 does not prohibit the Legislature from requiring an arbitration proceeding prior to the filing in court of a medical malpractice suit . . . .

Accordingly, I am persuaded that plaintiffs may not maintain a private cause of action under Maryland law based on a claim of discrimination with respect to a place of public accommodation.  Therefore, I shall dismiss Count IV.

## C.  Negligence Claims: Immunity

Defendants urge the Court to dismiss the negligence claims in Counts I through III as to the County and the CCBC Defendants.  ECF 24-1 at 2.  They argue that Maryland has "waived the County's governmental [immunity], via the LGTCA, only to the extent of the County's duty to defend and indemnify its employees."  ECF 24-1 at 4 (citing C.J. §§ 5-302 and 5-303).  But, defendants contend that the LGTCA does not authorize suit directly against the local government.  *See* ECF 24-1 at 4; *see, e.g.*, *Beall v. Holloway-Johnson*, 446 Md. 48, 77, 130 A.3d 406, 423 (2016).  And, defendants assert that a community college board of trustees is "extended the same immunity."  ECF 24-1 at 4 (citing C.J. § 5-519).  Accordingly, in defendants' view, "there is no legal or factual basis for a direct claim to lie against the County or Board of Trustees for CCBC based upon the factual allegations of the Complaint."  ECF 24-1 at 5.

Then, in the Reply, defendants contend in a caption that CCBC and the Board "have sovereign immunity for state claims above $100,000."  ECF 35 at 4 (citing C.J. § 5-519; Md. Code (2021 Repl. Vol.), § 16-107 of the Education Article ("Educ.")).  But, in the text of the Reply, defendants seem to assert sovereign immunity only as to the Board.

Plaintiffs aver that neither the County nor the CCBC Defendants are entitled to the bar of sovereign immunity.  ECF 32 at 4.  Further, plaintiffs contend that CCBC is "a local entity" that can be sued up to the limits of its insurance.  *Id.* (citing C.J. § 5-519).  In the alternative, plaintiffs urge the Court to disregard the doctrine of sovereign immunity on the ground that it is anti-

democratic, a violation of the Establishment Clause of the First Amendment to the Constitution, and was abrogated by the Seventh Amendment.  *Id.* at 5.

### 1.   The Doctrine of Sovereign immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."

The Supreme Court has explained: "Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suit for damages by citizens against their own States."  *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (collecting cases); *see, e.g.*, *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011); *Lapides v. Bd. of Regents of Univ. Sys. of Georgia,* 535 U.S. 613, 618 (2002); *Kimmel v. Fla. Bd. of Regents*, 528 U.S. 62, 72-73 (2000); *see also Pense v. Md. Dep't of Public Safety and Correctional Services*, 926 F.3d 97, 100 (4th Cir. 2019) ("The Supreme Court 'has drawn on principles of sovereign immunity to construe the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'") (Quoting *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012).  Thus, "the ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."  *Garrett*, 531 U.S. at 363; *see Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019), *cert. denied*, __ U.S.__, 140 S. Ct. 903 (2020).[11]

---

[11]  As noted, plaintiffs did not sue defendants in federal court.  Rather, the defendants removed the case to federal court.

Accordingly, absent waiver or a valid congressional abrogation of sovereign immunity, the states enjoy immunity from suits for damages brought in federal court by their own citizens, even though the text of the Eleventh Amendment does not explicitly address such a scenario. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Garrett*, 531 U.S. at 363 ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted).

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas*, 666 F.3d 244, the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

As the Supreme Court recognized in *Garrett*, 531 U.S. at 363, among several other decisions, it has construed the Eleventh Amendment to embody the broader principles of state sovereign immunity. The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities . . . ." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002). But, the doctrine of state sovereign immunity from

private suit predates the enactment of the Eleventh Amendment.   And, it is "a broader doctrine . . . ."   *See Williams v. Morgan State Univ.*, 850 F. App'x 172, 174 (4th Cir. 2021) (per curiam) (citing *Alden v. Maine*, 527 U.S. at 724 (1999); *Hans*, 134 U.S. at 3).[12]

Of import here, sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, sometimes referred to as an "arm of the state." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense*, 926 F.3d at 100; *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).   Put another way, sovereign immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195-96 (4th Cir. 2016) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (cleaned up).   In contrast, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta by and through Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) ("*Ram Ditta*") (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)).

_____

[12] In *Williams*, 850 F. App'x at 174, the Fourth Circuit described the text of the Eleventh Amendment as a "rather narrow and precise provision . . . ."   *Id.*

Sovereign immunity is "a weighty principle, foundational to our constitutional system." *Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021). The Fourth Circuit has made clear that the defense of sovereign immunity is a jurisdictional bar, explaining that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___U.S. ___, 139 S. Ct. 417 (2018). However, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)); *see DiCocco v. Garland*, 18 F.4th 406, 414 (4th Cir. 2021).

## 2. The County

As mentioned, sovereign immunity is not available to political subdivisions of a State, such as a county. *Ram Ditta*, 822 F.2d at 457. But, counties in Maryland enjoy governmental immunity in negligence actions when the conduct on which the suit is based is governmental, not proprietary. *Pavelka v. Carter*, 996 F.2d 645, 648 (4th Cir. 1993); *see Devi v. Prince George's County*, DKC-16-3790, 2017 WL 3592452, at *2 (D. Md. Aug. 21, 2017) ("[M]unicipalities are generally immune from common law tort suits when engaged in governmental, as opposed to proprietary, acts") (citing *DiPino v. Davis*, 354 Md. 18, 47, 729 A.2d 354, 369-70 (1999); *Nam v. Montgomery County*, 127 Md. App. 172, 182, 732 A.2d 356, 362 (1999)).

Title 5, Subtitle 3 of the Courts and Judicial Proceedings Article of the Maryland Code is captioned "Local Government Tort Claims Act". C.J. § 5-303(b)(1) provides that "a local government shall be liable for any judgment against its employee for damages resulting from

tortious acts or omissions committed by the employee within the scope of employment with the local government." Under C.J. § 5-303(b)(2), a local government is barred from "assert[ing] governmental or sovereign immunity to avoid the duty to defend or indemnify an employee," as established in C.J. § 5–303(b)(1).  *See Balt. Police Dep't v. Cherkes*, 140 Md App. 282, 318, 780 A.2d 410, 431 (2001).

C.J. §§ 5–303(d) and (e) expressly reserve the preexisting common law and statutory defenses and immunities of local governments and their employees, and the right of the local government to assert such defenses and immunities, as follows:

> (d) Notwithstanding the provisions of [§ 5-303(b),] this subtitle does not waive any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by an employee of a local government.

> (e) A local government may assert on its own behalf any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by its employee for whose tortious act or omission the claim against the local government is premised and a local government may only be held liable to the extent that a judgment could have been rendered against such an employee under this subtitle.

"With the enactment of the LGTCA, the [Maryland] Legislature sought to provide 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'"  *Rios v. Montgomery County*, 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (quoting *Ashton*, 339 Md. at 108, 660 A.2d at 466), *aff'd*, 386 Md. 104, 872 A.2d 1 (2005).  Of relevance here, the LGTCA does not permit a plaintiff to sue the local government directly.  Rather suit is brought against the employee, and the local government is responsible for payment of a judgment.  *Beall*, 446 Md. at 77, 130 A.3d at 423; *see Hansel v. City of Laurel*, 420 Md. 670, 679-80 n.5, 25 A.3d 122, 127 n.5 (2011) (stating that the LGTCA "does not waive the limited immunity enjoyed by local

governments . . . ."); *Williams v. Maynard*, 359 Md. 379, 394, 754 A.2d 379, 388 (2000) (stating that "the LGTCA does not waive governmental immunity or otherwise authorize any actions directly against local governments"); *Hous. Auth. v. Bennett*, 359 Md. 356, 357-58, 754 A.2d 367, 367-68 (2000) (superseded in part by statute on other grounds); *see also Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 234 (4th Cir. 2002) ("Under Maryland law, a county 'is immune from liability for tortious conduct committed while the entity was acting in a governmental capacity.'") (quoting *DiPino*, 354 Md. at 47, 729 A.2d at 370); *Pavelka*, 996 F.2d at 649 ("The LGTCA does not waive local governmental immunity when a local governmental entity is sued in its own capacity"); *Dawson v. Prince George's County*, 896 F. Supp. 537, 539 (D. Md. 1995) (stating that local government is financially responsible for a judgment against an employee, but the LGTCA "does not create liability" on the part of the municipality).

Therefore, the LGTCA does not permit plaintiffs to name the County directly in a common law tort suit. *See, e.g.*, *Devi*, 2017 WL 3592452, at *2; *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 378 (D. Md. 2011); *Martino v. Bell*, 40 F. Supp. 2d 719, 722 (D. Md. 1999)  Instead, C.J. § 5-303(b) requires the County to indemnify its employees for damages resulting from their tortious acts.

Plaintiffs decry this position as anti-democratic.  ECF 32 at 5.  But, as the Reply explains, this outcome is the result of a decision by "the legislature of a sovereign state, elected by the people," to "extend immunity, by statute to certain persons and entities, with the consent of the governed from whom power flows."  ECF 35 at 4 (citation omitted).  Accordingly, Counts I through III shall be dismissed as to the County.

However, to the extent that the Motion seeks the dismissal of the County from the entire suit, ECF 24-1 at 5, this would be improper.  In particular, Count XI lodges a claim against all

defendants, including the County, for a violation of Title IX.  *See* ECF 11, ¶¶ 188-206.   And, the Motion does not challenge Count XI on any basis.

Title IX provides, in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).   A "program or activity" refers, in part, to "all of the operations" of the following:

> (A)    a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B)    the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government.

20 U.S.C. § 1687(1)(A)-(B); *see Fordyce v. Prince George's County, Md*., 43 F. Supp. 3d 537, 546 (D. Md. 2014) (explaining that "although the statute by its plain language applies to recipients of federal funding, the recipient must also be an 'education program or activity'") (quoting 20 U.S.C. § 1681(a)).   Further, "[a]n implied private right of action exists for enforcement of Title IX." *Preston v. Virginia ex rel. New River Community College*, 31 F.3d 203, 205-05 (4th Cir. 1994) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)).

In the Complaint, plaintiffs aver that all defendants, including the County, "were engaged, at all times relevant, in a 'program or activity'" within the meaning of Title IX.  ECF 11, ¶ 193 (quoting 20 U.S.C. § 1687).  As mentioned, defendants do not challenge the viability of plaintiffs' Title XI claim as to the County.  Therefore, dismissal of the County as to Count XI is not warranted.

### 3.   CCBC and CCBC-Dundalk

Defendants appear to refer to the Board and CCBC interchangeably throughout the Motion and the Reply.  *See*, *e.g.*, ECF 24-1 at 4-6; ECF 35 at 4-6.

In the context of whether a litigant named the proper party in a suit, based on an earlier administrative claim, the Fourth Circuit concluded in *Alvarado v. Bd. of Trustees of Montgomery Comm. College*, 848 F.2d 457 (4th Cir. 1998), that, "under Maryland law, the board of trustees is identical with the college itself for purposes of suit . . . ." *Id.* at 460.  The Court also said, *id.*: "Maryland has by statute created boards of trustees and empowered them to establish and operate community colleges."  And, the Board is empowered by statute to "sue and be sued."  Educ. § 16-103(k).  Yet, the *Alvarado* Court observed, 848 F.2d at 460: "No such provision is included in the statutes to empower the college itself to sue and be sued."

Further, the Fourth Circuit stated, *id.*: "Alvarado properly filed suit against the board of trustees . . . ."  It added: "Of course, had Alvarado filed suit against the college instead [of the board of trustees], he would presumably have been entitled to amend his pleadings under Fed. R. Civ. P. 15(a) and (c), if necessary."  *Id.* at 460 n.4; *see Hood-Wilson v. Community College of Baltimore County*, RDB-20-0124, 2020 WL 4436379, at *4 (D. Md. Aug. 3, 2020) (citing *Alvarado*, 848 F.2d at 460, in support of the proposition that "CCBC is not subject to suit and that the proper party is the Board of Trustees of the Community College of Baltimore County"), rev'd and remanded on other grounds, 850 F. App'x 844 (4th Cir. 2021) (per curiam).

Therefore, CCBC and CCBC-Dundalk shall be dismissed from the suit.  Nonetheless, as stated, the Board and CCBC are "identical for purposes of suit . . . ." *Alvarado*, 848 F.2d at 460.  Accordingly, I shall construe plaintiffs' claims against CCBC and CCBC-Dundalk as claims against the Board.

### 4.  The Board

The defense claims that the Board is entitled to sovereign immunity.  ECF 35 at 2, 4.  Defendants assert:  "There is no question that sovereign immunity applies to the Board of Trustees

of public community colleges." *Id.* at 4. Plaintiffs maintain that the Board is not entitled to sovereign immunity because it is classified as a local entity by the LGTCA. *See* ECF 32 at 4 (citing C.J. § 5-301(d)(9)).

To determine whether an entity is sufficiently connected to a State for purposes of sovereign immunity, the Fourth Circuit has articulated a nonexclusive list of four factors to be considered: (1) whether the State will pay any judgment against the defendant entity; (2) "'whether the entity exercises a significant degree of autonomy from the state,'" (3) "'whether [the entity] is involved with local versus statewide concerns,'" and (4) "'how [the entity] is treated as a matter of state law.'" *Lane*, 660 F. App'x at 195 (alterations in original) (some alterations omitted) (quoting *Ram Ditta*, 822 F.2d at 457); *cf. Van Story v. Washington County Health Dep't*, ELH-17-3590, 2019 WL 3340656, at *9 (D. Md. July 25, 2019), *aff'd*, 830 F. App'x 725 (4th Cir. 2020) (per curiam).

"The primary factor to be considered is whether a judgment against the governmental entity would be paid from the state's treasury." *Adams v. Montgomery Coll.*, DKC-09-2278, 2010 WL 2813346, at *3 (D. Md. July 15, 2010) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994)). Accordingly, if the judgment would be paid from the State treasury, the inquiry is at an end. *Hess*, 513 U.S. at 50. But, even where a judgment would not be paid from the State treasury, the remaining three factors may sufficiently connect the entity to the State so that suit against the entity would amount to suit against the State. *Cash*, 242 F.3d at 224.

Here, a review of Maryland statutes and case law makes amply clear that the Board is a State entity for purposes of sovereign immunity.

Educ. § 16-101 is titled "Board of community college trustees." It states, in relevant part: "There is a board of community college trustees in each county that has one or more community

27

colleges." *Id.* § 16-101(a). In addition, Maryland law expressly provides for the creation of a fifteen-member Board of Community College Trustees for Baltimore County. *Id.* § 16-402(a). The members are "appointed by the Governor, with the advice of the senate." *Id.* Notably, the Board is empowered by law to sue and be sued. Educ. § 16-103(k). And, Educ. § 16-107(d), titled "Defense of Sovereign Immunity," is also pertinent. It states: "This section does not prevent any board of trustees, on its own behalf, from raising the defense of sovereign immunity described under [C.J.] § 5-519 . . . ." Moreover, C.J. § 5-519 is titled "Immunity—Community Colleges." It provides: "Section 16-107 of the Education Article does not prevent a board of community colleges trustees . . . on its own behalf, from raising the defense of sovereign immunity to any amount of a claim in excess of the limit of an insurance policy or in excess of $100,000 in the case of self-insurance."

Further, Maryland courts treat entities such as the Board as instrumentalities of the State for purposes of sovereign immunity. *See Bd. of Trustees of Howard County Comm. College v. John K. Ruff, Inc.* 278 Md. 580, 587, 366 A. 2d 360, 364 (1976) ("In short, in light of the pertinent statutes and our decisions, there is no doubt that the Board of Trustees of Howard County Community College[ ] is an agency of the State."); *Samuels v. Tschectelin*, 135 Md. App. 483, 521, 763 A.2d 209, 230 (2000) (stating that Baltimore City Community College "along with its governing Board, is a State agency afforded the protections of sovereign immunity"). And, judges of this court have reached the same conclusion. *See*, *e.g.*, *Edwards v. Montgomery Coll.*, TDC-17-3802, 2018 WL 4899311, at *4 (D. Md. Oct. 9, 2018); *Adams*, 2010 WL 2813346, at *4; *Williams v. Bd. of Trustees of Frederick Community College*, CCB-03-2123, 2004 WL 44517, at *4 (D. Md. Jan. 8, 2004).

I am persuaded that the Board is a State agency for purposes of sovereign immunity. Thus, the Board is entitled to immunity from suit, absent a waiver by "express or implied statutory authorization." *Nam*, 127 Md. App. at 182, 732 A.2d at 362.

Relevant here, Maryland law requires the board of trustees for each community college to "carry comprehensive liability insurance to protect the board, its agents and employees, and the agents and employees and employees of any community college under its jurisdiction." Educ. § 16-107. As noted, Educ. § 16-107(d) and C.J. § 5-519 permit a board of trustees to assert sovereign immunity as to any portion of a claim that exceeds insurance coverage or $100,000 in the event of self-insurance. Given this framework, the Maryland Court of Appeals has ruled that an earlier iteration of Educ. § 16-107 constituted "a partial waiver of sovereign immunity," limited to "those claims which would be covered by such a 'comprehensive liability insurance' policy and, to the extent of the policy, provides a fund from which these can be paid." *Charles E. Brohawn & Bros v. Bd. of Trustees of Chesapeake College*, 269 Md. 164, 171-72, 304 A.2d 829, 823 (1973).

There is a dearth of authority interpreting the scope of the partial waiver of sovereign immunity found in Educ. § 16-107 and C.J. § 5-519. But, Maryland courts have examined in greater detail the contours of an analogous waiver as to the State's local boards of education. *See Bd. of Educ. of Balt. County v. Zimmer-Rubert*, 409 Md. 200, 973 A.2d 233 (2009); *Davis v. Board of Educ. for Prince George's County*, 222 Md. App. 246, 112 A.3d 1034 (2015).

By way of background, Educ. § 4-105(a)(1) provides: "Each county board [of education] shall carry comprehensive liability insurance to protect the board and its agents and its employees." Section 4-105(c) provides:

(1) A county board complies with this section if it:

> (i)     Is individually self-insured for at least $400,000 for each occurrence
>         under the rules and regulations adopted by the State Insurance
>         Commissioner; or
>
> (ii)    Pools with other public entities for the purpose of self-insuring property
>         or casualty risks under Title 19, Subtitle 6 of the Insurance Article.

And, § 4-105(d) states: "A County board shall have the immunity from liability described under § 5-518 of the Courts and Judicial Proceedings Article."  In turn, C.J. § 5-518 is titled "Immunity—County boards of education."  It prescribes, in relevant part, *id.*:

> (b) Claims for more than $400,000—A county board of education . . . may raise the
> defense of sovereign immunity to any amount claimed above the limit of its
> insurance policy or, if self-insured or a member of a pool described under § 4-
> 105(c)(1)(ii) of the Education Article, above $400,000.
>
> (c) Claims for less than $400,000—A county board of education may not raise the
> defense of sovereign immunity to any claim of $400,000 or less.

In *Zimmer-Rubert*, 409 Md. at 203, 973 A.2d at 235, the Maryland Court of Appeals discussed whether C.J. § 5-518(c) constituted a waiver of the Baltimore County Board of Education's immunity from suit in federal court for claims under $100,000.[13]  The Maryland Court of Appeals applied *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985), superseded on other grounds, as recognized in *Lane v. Pena*, 518 U.S. 187, 198 (1996), and concluded that this language constituted a waiver of sovereign immunity in both state and federal courts.  *See Zimmer–Rubert,* 409 Md. at 215, 973 A.2d at 242.  The Maryland court contrasted the General Assembly's use of the term "any claim" in C.J. § 5–518(c) with S.G. § 2–201's more limited waiver of sovereign immunity, available "in a court of the State."  It reasoned that "if the General Assembly intended to preserve the State's Eleventh Amendment protection, that body

---

[13] At the time, C.J. § 5-518(b) stated:  "A county board of education . . . may raise the defense of sovereign immunity to any amount claimed above the limit of its policy  or, if self-insured or a member of a pool . . ., above $100,000."  And, § 5-518(c) provided: "A county board of education may not raise the defense of sovereign immunity to any claim of $100,000 or less."

knew how to do so by merely limiting the State's liability to any claim brought 'in a court in this State,' or words to that effect." *Id.* at 216, 973 A.2d at 243; *see also Lee–Thomas,* 666 F.3d at 253 (discussing *Zimmer–Rubert* and deferring to the interpretation of the Maryland Court of Appeals).

*Davis*, 222 Md. App. 246, 112 A.3d 1034, also provides guidance. The case concerned "a survival suit and wrongful death action, in negligence" lodged against the Prince George's County Board of Education (the "PG Board"), stemming from the death of a thirteen-year-old girl who "was hit by a car as she was crossing the street to board a school bus." *Id.* at 253, 112 A.3d at 1037. The jury found the PG Board negligent and awarded damages to plaintiffs in an amount exceeding $90 million. *Id.* at 253, 112 A.3d at 1038. The PG Board moved for judgment notwithstanding the verdict, averring, among other things, that it was immune from liability for damages over $100,000, pursuant to C.J. § 5-518, "and therefore the judgment [should] be reduced to that amount." *Id.* The Circuit Court for Prince George's County granted the motion. *Id.*

Of relevance here, the Maryland Court of Special Appeals said, *id.* at 275, 112 A.3d at 1050:

> If the evidence shows that the Board was privately insured with limits above $100,000, then the verdict should be reduced to the amount of the policy limit. If the evidence shows that the Board was self-insured or part of a pool, the verdict should be reduced to $100,000. If the evidence shows that the Board did not have any insurance at all, the verdict should not be reduced pursuant to [Educ. § 4-105] and [C.J. § 5-518].

Read together, these cases instruct that, under Educ. § 4-105 and C.J. § 5-518, a county board of education may assert sovereign immunity in federal court with respect to the amount of liability, but not as to suit altogether.

And, Educ. § 16-107 and C.J. § 5-519 call for the same conclusion. C.J. § 5-519 asserts only that a community college board of trustees may raise the defense of sovereign immunity as to "any amount of a claim in excess of the limit of an insurance policy or in excess of $100,000 in

the case of self-insurance."  As Judge Blake has explained, C.J. § 5-518 "waived the Eleventh Amendment defense with respect to suits in federal court against local school boards for less than $100,000" and "[t]he following provision . . . § 5-519, does the same for state community colleges . . . ."  *Jones v. Williams*, CCB-11-793, 2012 WL 4470239, at *4 n.3 (D. Md. Sept. 5, 2012), order amended on other grounds by 2012 WL 6800786, at *2 (D. Md. Nov. 16, 2012).  *See also Grimm v. First Advantage Background Servs. Corp.*, LOG-17-1967, 2017 WL 11505354, at *2 (D. Md. Nov. 9, 2017) (finding that CCBC's Board could assert immunity from entire suit where plaintiff brought a claim arising under federal statutory law because "[t]here [was] no suggestion that statutory torts . . . would be covered by CCBC's comprehensive liability insurance policy.").

Plaintiffs assert claims for compensatory and punitive damages in excess of $150,000. ECF 11 at 37.  Accordingly, defendants may claim sovereign immunity to the extent plaintiffs seek to recover more than the limits of an insurance policy, or $100,000 in the case of self-insurance. *See* C.J. § 5-519.  But, as to claims covered by insurance or less than $100,000 in the event of self-insurance, the Board is not entitled to dismissal from suit on the ground of sovereign immunity.

### D.  Negligence: Failure to State Claims

As mentioned, the Complaint lodges three species of negligence claims as to all defendants: negligence; negligent hiring, training, supervision, and retention; and gross negligence.  ECF 11, ¶¶ 135-51.  The defense asserts that, under Rule 12(b)(6), Counts I through III fail to state a claim for which relief can be granted.  ECF 24-1 at 3, 8.  Further, they state that "the mere allegation that there has been a violation of Title IX is not sufficient to maintain a claim for negligent supervision and retention."  ECF 24-1 at 5.[14]

---

[14] In the Motion, defendants do not specifically address the claims of negligence and gross negligence.

In addition, defendants posit that they "did not have a special duty to Student Doe and her parents merely because Student Doe was a minor and attending an educational institution as alleged in the Complaint." *Id.* at 7 (citation omitted). In their view, the duty known as *in loco parentis* "exists only at primary and secondary schools, grades K-12, in which compulsory attendance of minor children is required by law." *Id.* (citing Educ. § 7-301).

Plaintiffs counter that the arguments raised by the Motion do not dispose of Counts I through III. To the contrary, plaintiffs aver: "Defendants failed to supervise [Webster] whatsoever given his pre-employment background and his expressed sexual desire for Plaintiff to his boss." ECF 32 at 7. Moreover, they assert: "Defendants continued to retain Defendant Webster after he expressed sexual desire for a minor student." *Id.* And, they allege that the failure of Webster's boss to "report" Webster left "Plaintiff vulnerable to Defendant Webster's emotionally traumatizing behavior and unwarranted touching—causing her to leave CCBC." *Id.*[15]

In the Reply, defendants reassert that the "mere allegation that harassment may have occurred is not sufficient, by itself, to make a prima facie claim for negligence, gross negligence, or negligent supervision and retention." ECF 35 at 6. The Reply also points out that "Plaintiffs pled no facts that Mr. Webster had any inappropriate conduct with Student Doe prior to December 13, 2017, nor are there any allegations that the [defendants] failed to take prompt and adequate remedial action once this event was reported to them." *Id.*

---

[15] The Complaint does not include an allegation that Webster "touched" Student Doe. And, it is well established that "'a complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Sager v. Hous. Comm'n of Anne Arundel County,* 855 F. Supp. 2d 524, 557 (D. Md. 2012) (quoting *Arbitraje Casa de Cambio, S.A. v. U.S. Postal Serv.,* 297 F. Supp. 2d 165, 170 (D.D.C .2003)). Therefore, I shall not consider this contention in resolving the Motion.

### 1.  Duplicative Claims

Before reaching the merits of the Motion's arguments, I note that Counts I and II are duplicative because they "stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010) (citing *McGee v. District of Columbia*, 646 F. Supp. 2d 115, 121-22 (D.D.C. 2009)).  And, a district court "has discretion to dismiss duplicative claims where they allege the same facts and the same injury." *C&K NuCo, LLC, Expedited Freightways, LLC*, 13 C 4006, 2014 WL 4913446, at *12 (N.D. Ill. Sept. 30, 2014); *see W. Veg-Produce, Inc. v. The Lexy Group*, 2:18-cv-00180-ODW, 2018 WL 1804689, at *5 (C.D. Cal. Apr. 16, 2018) ("'A court may dismiss duplicative claims in its discretion.'") (quoting *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 18 (D.D.C. 2014)); *Wultz*, 755 F. Supp. 2d at 81 ("As a matter of judicial economy, courts should dismiss a claim if it is duplicative of another claim in the same suit.").

Here, both counts lodge a claim against all defendants.[16]  To be sure, Count I asserts a more general claim for negligence (ECF 11, ¶¶ 135-43), whereas Count II alleges the tort of negligent hiring, training, supervision, and retention.  *Id.* ¶¶ 144-147.  But, under Maryland law, the elements of a claim for negligent selection, training, supervision, or retention are functionally the same as in an ordinary claim for negligence.  *See Jones v. State*, 425 Md. 1, 18, 38 A.3d 333, 343 (2012); *Gandy*, 2021 WL 3911892, at *5; *Karn v. PTS of Am., LLC*, GJH-16-3261, 2018 WL 3608772, at

---

[16] Count I is lodged against the "Government Entities" as well as the "Individual Defendants," (see ECF 11, ¶¶ 135-43), whereas Count II appears to state a claim only as to the "Government Entities."  *See id.* ¶¶ 136-37.  But, the Complaint defines "Government Entities" as all "Individual and Entity Defendants, and their agents, servants, and employees . . . ."  *Id.* ¶ 18.  Thus, it appears that plaintiffs' use of "Government Entities" refers to all defendants.

*3 (D. Md. July 26, 2018); *Marrick Homes LLC v. Rutkowski*, 232 Md. App. 689, 709, 161 A.3d 53, 65 (2017).[17]

Further, both counts allege that defendants stood *in loco parentis* to Student Doe and owed her a duty to "prevent an individual who posed an unreasonable risk of harm" from "interacting and having access" to her. *Id.* ¶¶ 136-37, 145. In addition, both counts contend that defendants breached that duty, in essence, by failing to exercise reasonable care in hiring, training, supervising, and retaining Webster, thereby enabling him to harass Student Doe. *See id.* ¶¶ 138-141, 146. And, both counts claim that defendants' actions, or lack thereof, caused plaintiffs "personal injuries, damages, and harms . . . ." *See id*. ¶¶¶ 143, 147.

Accordingly, as I see it, Counts I and II are rooted in the same factual allegations and theory of liability; thus, they are duplicative. *See Cupp on behalf of Cupp v. County of Lycoming*, 3:20-cv-001784, 2021 WL 4478304, at *7 (M.D. Pa. Sept. 30, 2021) (dismissing a claim as duplicative where it did not "'present any legal or factual theories that [were] not already subsumed'" in another count) (alteration added) (quoting *Rodriguez v. Lab. Corp. of Am. Holdings*, 13 F. Supp. 3d 121, 128 (D.D.C. 2014); *Lucas v. Tempe Union High School Dist*., CV-17-02302-PHX-JAT, 2019 WL 3083010, at *11 (D. Ariz. Jul. 15, 2019) (explaining that plaintiffs' Title VII claims for disparate treatment and failure to hire were duplicative of one another because they "relie[d] on the same underlying employment actions and related allegations").

---

[17] When considering a State law claim, the Court must apply the law of the forum state (including as to choice of law), whether proceeding under supplemental or diversity jurisdiction. *See, e.g.*, *Nash v. Montgomery County*, GJH-20-1138, 2021 WL 1222874, at *7 n.7 (D. Md. Mar. 31, 2021); *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008). In tort actions, Maryland adheres to the rule of *lex loci delicti*, meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph,* 529 F. Supp. 2d at 606 (citing *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619, 925 A.2d 636, 648-49 (2007)) (other citations omitted).

In my view, Count II is clearly the more appropriate vehicle to address plaintiffs' negligence claim.  In order to avoid confusion and duplicated effort associated with duplicate claims, and to avoid the need to pare the claims at a later time, I shall dismiss Count I, as duplicative.

### 2.   Negligent Hiring, Training, Supervision, and Retention

Count II is styled as a claim for negligent hiring, training, supervision, and retention.  ECF 11, ¶¶ 135-43, 144-147.   In this context, "[a]s in any action for negligence, a plaintiff . . . must prove duty, breach, causation, and damages."  *Fid. First Home Mortg. Co. v. Williams*, 208 Md. App. 180, 198, 56 A.3d 501, 511 (2012) (citing *Cramer v. Hous. Opportunities Comm'n of Montgomery County*, 304 Md. 705, 712-14, 501 A.2d 35, 38-40 (1985)).

Relevant here, under Maryland law, "an employer is obligated 'to the public to use due care in selecting and retaining only competent and careful employees.'"  *Asphalt & Concrete Servs., Inc. v. Perry*, 221 Md. App. 235, 256, 108 A.3d 558, 570 (2015) (quoting *Henley v. Prince George's County*, 60 Md. App. 24, 36, 479 A.2d 1375, 1382 (1984), *rev'd* in part on other grounds, 305 Md. 320, 503 A.2d 1333 (1986)).  The essence of the duty was expressed by the Maryland Court of Appeals in *Evans v. Morsell*, 284 Md. 160, 166, 395 A.2d 480, 483 (1978) (citation omitted):

> One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment.

Further, that court said: "Where an employee is expected to come into contact with the public . . .  the employer must make some reasonable inquiry before hiring or retaining the

employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee." *Id.* at 166–67, 395 A.2d at 484.

Thus, with respect to a claim that an employer was negligent in hiring, training, supervising, or retaining an employee who committed an intentional tort against a member of the public, a plaintiff must plead facts that, if proven, would establish (1) "'her injury was caused by the tortious conduct of [an employee]'"; (2) "'that the employer knew or should have known by the exercise of diligence and reasonable care that the [employee] was capable of inflicting harm of some type'"; (3) "'that the employer failed to use proper care in selecting, supervising, or retaining that employee'"; (4) "'and that the employer's breach of its duty was the proximate cause of the Plaintiff's injuries.'" *Jordan v. Western Distributing Co.*, 135 F. App'x 582, 589 (4th Cir. 2005) (per curiam) (alterations in *Jordan*) (quoting *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 752 (D. Md. 1996)).

There is a "'rebuttable presumption that an employer uses due care in hiring an employee.'" *Grimes v. Dunnigan*, CCB-13-935, 2013 WL 3353739, at *4 (D. Md. July 2, 2013) (quoting *Evans*, 284 Md. at 165, 395 A.2d at 483). Moreover, the "nature  and of extent of the inquiry that is needed will naturally vary with the circumstances." *Evans*, 284 Md. at 166-67, 395 A.2d at 484. For example, with respect to an employee's intentional torts, "the critical standard is 'whether the employer knew or should have known that the individual was potentially dangerous.'" *Jordan*, 135 F. App'x at 589 (quoting *Bryant*, 923 F. Supp. at 752)).

As mentioned, under Maryland law "the Plaintiff must establish that her injury was caused by the *tortious* conduct of a coworker . . . ." *Bryant*, 923 F. Supp. at 751 (emphasis added) (citing *Evans*, 284 Md. at 164, 395 A.2d at 483). In other words, a claim for negligent hiring, training, supervision, and retention  "must be based on actions that constitute a common law violation, not

a federal statutory violation." *Nammack v. Hampstead Pre-Owned*, DKC-19-1798, 2020 WL 1033589, at *6 (D. Md. Mar. 3, 2020); *see Young v. Hous. Auth. Of Balt. City*, MJG-17-713, 2017 WL 5257127, at *12 (D. Md. Nov. 13, 2017) (dismissing negligent hiring claim on the ground that there was no "underlying tort claim at common law that could give rise to a negligence claim in this context"); *Bryant*, 923 F. Supp. at 751 (explaining that a court "may not impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law") (citation and internal quotation marks omitted).

In the Motion, defendants contend that "the mere allegation that there has been a violation of Title IX is not sufficient to maintain a claim for negligent supervision and retention." ECF 24-1 at 5. But, they overlook that Count X asserts a claim for intentional infliction of emotional distress (*see* ECF 11, ¶¶ 183-87), which is actionable under Maryland common law. *See Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977) (explaining the elements of a claim for intentional infliction of emotional distress under Maryland law). And, the Motion does not challenge the viability of Count X.

Accordingly, assuming no other fatal deficiencies or flaws, Count II could proceed under the theory that the Board was negligent in hiring, training, supervising, and retaining Webster, thereby providing him an opportunity to engage in tortious conduct. *See David's Beautiful People, Inc.*, DKC-14-2483, 2016 WL 429963, at *8 (D. Md. Feb. 4, 2016) (finding that plaintiff's claim for negligent supervision and retention could survive the motion to dismiss stage because plaintiff had also pled claims for assault and battery); *Parker v. Ciena Corp.*, WDQ-14-4036, 2016 WL 153035, at *7 (D. Md. Jan. 12, 2016) (explaining that plaintiff's claim for negligent hiring would have been viable if her claim for intentional infliction of emotional distress had not been dismissed from suit).

The parties dispute, however, whether, and to what extent, the Board owed any duty to plaintiffs.  In particular, plaintiffs contend that defendants "had a *loco parentis* relationship with its students" and thus "ha[d] a special duty to protect each student," especially minor students, "from harm."  ECF 11, ⁋ 119.  The Motion rejects that view, arguing that the *in loco parentis* doctrine "exists only at primary and secondary schools, grades K-12, in which attendance of minor children is required by law."  ECF 24-1 at 7.  Moreover, defendants assert: "The fact that some post-secondary students happen to be minors does not change the nature of the institution nor create any special duty that the institution would not have to any other members of the public." *Id.* at 8.

With limitations, Maryland recognizes "'the doctrine that the relation of a school vis à vis a pupil is analogous to one who stands *in loco parentis*, with the result that a school is under a special duty to exercise reasonable care to protect a pupil from harm.'"  *Willey v. Bd. of Educ. of St. Mary's County*, __F. Supp. 3d___, 2021 WL 3857950, at \*14 (D. Md. Aug. 30, 2021) (quoting *Eisel v. Bd. of Educ. of Montgomery County*, 324 Md. 376, 384, 795 A.2d 447 451-52 (1991)).  But, as the Motion points out, this doctrine is not applicable in a context where there is no intention that the relevant institution may "exercise the authority and control . . . [that] primary and secondary schools do."  ECF 24-1 at 8 (citing *Molock v. Dorchester County Family YMCA, Inc.*, 139 Md. App. 664, 673, 779 A.2d 963 (2001)).

To my knowledge, under Maryland law, institutions of higher education—universities and colleges—do not stand *in loco parentis* as to their students.  And, plaintiffs fail to cite any Maryland case law to the contrary.

Plaintiffs cite *Mullins v. Pine Manor College*, 389 Mass. 47, 52, 449 N.E.2d 331, 335-36 (1983), in support of the proposition that the *in loco parentis* doctrine pertains to this case.  *See*

ECF 32 at 8.  But, *Mullins* turned on an interpretation of Massachusetts law.  *Id.* at 52, 449 N.E.2d at 336.  Moreover, the language quoted by the Opposition describes the view as a theory falling out of favor.  *Id.* at 52, 449 N.E.2d at 335.  And, even in *Mullins*, the defendant university's duty to its students was ultimately rooted in the "established principle that a duty voluntarily assumed must be performed with due care."  *Id.*

Further, courts throughout the country have rejected the *in loco parentis* doctrine in the collegiate setting.  *See, e.g.*, *Austin-Hall v. Woodard*, 3:18-cv-270, 2020 WL 5943018, at *6 (S.D. Ohio Oct. 7, 2020) ("The law is clearly established that colleges and universities do not stand *in loco parentis*."); *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 543 (N.D.N.Y. 2012) ("New York has affirmatively rejected the doctrine *in loco parentis* at the college level.") (quotation marks and citations omitted); *Benefield ex rel. Benefield v. Bd. of Trustees of University of Alabama at Birmingham*, 214 F. Supp. 2d 1212, 1220 (N.D. Ala. 2002) ("This court can find no notice to the defendant [university] from which it should have been aware it stood *in loco parentis*, nor does the court believe the creation of such a duty is in the public interest.") (alteration added); *Hartman v. Bethany College*, 778 F. Supp. 286, 293-94 (N.D. W. Va. 1991) ("A college does not stand *in loco parentis* to its seventeen year old college freshman."); *Millard v. Osborne*, 416 Pa. Super. 475, 487, 611 A.2d 715, 721 (1992) ("Clearly, in modern times, it would be inappropriate to impose an *in loco parentis* duty upon a university.").  For these reasons, I decline to find that the *in loco parentis* doctrine applies in this context.

That said, it does not necessarily follow that defendants owed no duty of care to Student Doe, or that *in loco parentis* is the only potential source of such a duty.  Rather, as stated, Maryland law specifies that an employer, such as the Board, owes a duty to members of the public to exercise

reasonable care in the hiring, training, supervision, and retention of its employees.  *See Perry*, 221 Md. App. at 256, 108 A.3d at 570.

The Motion makes no further argument as to the viability of Count II.  Thus, in my view, dismissal would be inappropriate at this juncture.

### 3.   Gross Negligence

Count III asserts a claim for gross negligence.  *See* ECF 11, ¶¶ 148-151.  In particular, plaintiffs allege: "Defendants owed Plaintiffs and all others a duty to act or refrain from acting in a manner that does not create a wanton and reckless disregard for others . . . ." *Id.* ¶ 149.  Moreover, the Complaint avers: "Defendant(s) breached this duty and were grossly negligent . . . ." *Id.* ¶ 150.

In *Marriott Corp. v. Chesapeake & Potomac Tel. Co.*, 124 Md. App. 463, 478, 723 A.2d 454, 462 (1998), *cert. denied*, 354 Md. 113, 72 A.2d 405 (1999), the Maryland Court of Special Appeals described gross negligence as

> "[a]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.  Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."

*Id.* (quoting *Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12 (1968)).

In short, "[g]ross negligence has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or the rights of others.'" *Foor v. Juvenile Servs. Admin.*, 78 Md. App. 151, 175, 552 A.2d 947, 956 (1989), *cert. denied* 316 Md. 364, 448 A.2d 1206 (1989);  *see Wells v. State*, 100 Md. App. 693, 702-03, 642 A.2d 879, 883-84 (1994) (stating that gross negligence "implies malice and evil intention") (citations and quotations omitted), *cert. denied* 336 Md. 560, 649 A.2d 602 (1994).  "When dealing with such a standard, bald and

conclusory allegations will not suffice; specificity is required.'" *Foor,* 78 Md. App. at 170, 552 A.2d at 956 (citing *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 168, 297 A.2d 721, 731-32 (1972) and *Nast v. Lockett,* 312 Md. 343, 370, 539 A.2d 1113, 1126-27 (1988)).   And, "'the quantity of the negligence in [a] case does not change the quality of that negligence so that it becomes different from ordinary lack of care.'" *The Maryland Jockey Club of Balt. City, Inc. v. Balt. Gas & Elec. Co.*, No. 2364 Sept. Term 2001, 2002 WL 32123994, at *10 (Md. Ct. Spec. App. Dec. 17, 2002) (quoting *Medina v. Meilhammer*, 62 Md. App. 239, 251, 489 A.2d 35, 41 (1985)).

For example, in *Wells,* 100 Md. App. 693, 642 A.2d 879, the Maryland Court of Special Appeals considered a suit with multiple claims lodged by adoptive parents, on behalf of their adopted son, against the State of Maryland, various supervisory employees of the State Department of Human Resources and the Baltimore City Department of Social Services ("DSS"), and some direct care social workers.  *Id.* at 695, 642 A.2d at 880.  They sought to recover damages for the abuse suffered by the infant plaintiff at the hands of his birth mother and her boyfriend.  *Id.* at 694, 642 A.2d at 879.  The abuse occurred over a seven-year period and resulted in the death of the infant plaintiff's sister.  *Id.* at 698, 642 A.2d at 881.  Then Chief Judge Wilner observed, *id*:

> [The Complaint] presents a saga of physical abuse suffered by these defenseless children throughout most of their lives, leading ultimately to the torture and death of [plaintiff's sister] at the age of nine, and a deeply disturbing dereliction on the part of DSS in failing to take effective remedial action when there existed within the Department adequate warning that the children-especially [plaintiff's sister]- were at risk.

Despite the plight of the children, the State's intermediate appellate court affirmed a dismissal of plaintiffs' gross negligence claim, based on the insufficiency of the allegations.  The *Wells* Court explained, *id.* at 705-06, 642 A.2d at 885:

These allegations, taken in the light most favorable to appellants, suggest individual negligence and bureaucratic mismanagement and incompetence; they suggest a critically important governmental unit not properly doing its job because of underfunding, understaffing, lack of effective leadership and supervision, lack of training, and lack of clear procedures and protocols. They do not indicate, however, malice, evil intention, or wanton, wilful, or reckless disregard for human life or the rights of others. In short, they do not allege gross negligence on the part of any of the defendants.

Plaintiffs' claim for gross negligence boils down to two allegations: (1) defendants failed to run a criminal background check on Webster, and (2) at least three of the Individual Defendants were aware that Webster harbored inappropriate feelings for Student Doe, but did not intervene. *See* ECF 11, ¶¶ 112-13. Measured against the facts described in *Wells*, these assertions plainly fall short of stating a claim for gross negligence. Certainly, the Complaint fails to allege any facts that, if proven, would tend to show that defendants acted with "wanton or reckless disregard for the rights of others." *Foor*, 78 Md. App. at 170, 552 A.2d at 956 (quotation marks and citation omitted). Accordingly, I shall dismiss Count III, without prejudice and with leave to amend.

## IV.    Conclusion

In light of the foregoing, the Motion shall be granted in part and denied in part. I shall dismiss Counts I and IV as to all defendants. In addition, Counts V through IX shall be dismissed as to all defendants, without prejudice. I shall also dismiss Count III as to all defendants, without prejudice and with leave to amend. Further, Count II shall be dismissed as to the County. And, CCBC and CCBC-Dundalk shall be dismissed from the suit.

The Motion shall otherwise be denied. An Order follows, consistent with this Memorandum Opinion.

Date: January 13, 2022

_____/s/_____
Ellen L. Hollander
United States District Judge

43